David J. Noonan (55966)
Micaela P. Banach (226656)
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, California 92101-8700
Telephone: (619) 231-8666
Facsimile: (619) 231-9593

Attorneys for Appellants Geraldine A. Valdez and
Enrique Hernandez-Pullido

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>JERRY LEE ICENHOWER dba Seaview Properties, and DONNA LEE ICENHOWER,<br><br>Debtors.<br><br>GERALDINE VALDEZ, et al.,<br><br>Appellants,<br><br>vs.<br><br>KISMET ACQUISITION, LLC,<br><br>Appellee. | Case Nos. 09 CV 589 BTM (BLM) and<br>09 CV 590 BTM (BLM)<br><br>Bankruptcy Case No. 03-11155-LA7<br>Adv. Proc. No. 04-90392<br>Adv. Proc. No. 06-90369<br><br>**NOTICE OF RECENT NINTH CIRCUIT DECISION**<br><br>Judge: The Honorable Barry T. Moskowitz<br>Hearing Date: October 29, 2010<br>Time:   11:00 a.m.<br><br>**Appeal No. 7** |

Appellants Geraldine A. Valdez and Enrique Hernandez-Pullido respectfully notify the Court of a recent decision from the Ninth Circuit Court of Appeals that is relevant to Appellants' pending appeal in this action (Appeal No. 7). The published decision (a copy of which is attached hereto) in *Miller v. City of Los Angeles*, No. 10-55235, 2011 WL 5084954, is pertinent to the following issues: (1) whether Appellants committed any violation of a court order, and (2) whether there is evidence to support a finding that the alleged violation caused harm, so as to support an award of compensatory sanctions in excess of $700,000.

///

///

1                                      Respectfully Submitted,

2    DATED: November 16, 2011         KIRBY NOONAN LANCE & HOGE LLP

4                                 By:   /s/ *Micaela P. Banach*
5                                             David J. Noonan
6                                             Micaela P. Banach
                                                 Attorneys for Appellants Geraldine A. Valdez and Enrique Hernandez-Pullido

*Kirby Noonan Lance & Hoge LLP*
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Lines 3, 7–28 blank.

KNLH\904677.1                                   -2-

2011 WL 5084954
Only the Westlaw citation is currently available.
United States Court of Appeals,
Ninth Circuit.

Georgia MILLER, individually; Denise Bailey, as Guardian ad Litem for P.A.M.; P.A. M., Jr., a minor, and as his authorized representative as successor in interest to Philip Arthur Miller, deceased, Plaintiffs–Appellees,
v.
CITY OF LOS ANGELES, Defendant–Appellant,
and
Los Angeles Police Department; William Bratton, Chief of Police; Cesar Mata, Sgt., Defendants.

No. 10–55235. | Argued and Submitted June 9, 2011. | Filed Oct. 27, 2011.

**Attorneys and Law Firms**

Amy Field (argued), Deputy City Attorney, Los Angeles, CA, for appellant City of Los Angeles.

John Burton (argued), Law Offices of John Burton, Pasadena, CA, for appellee Georgia Miller, et al.
Elbie Hickambottom, Jr., Gronemeier & Associates, P.C., Eagle Rock, CA, for appellee Georgia Miller, et al.

Appeal from the United States District Court for the Central District of California, Virginia A. Phillips, District Judge, Presiding. D.C. No. 5:07–cv–00806–VAP–CT.

Before ALEX KOZINSKI, Chief Judge, SANDRA S. IKUTA, Circuit Judge and LAWRENCE L. PIERSOL, District Judge.[*]

[*] The Honorable Lawrence L. Piersol, Senior District Judge for the District of South Dakota, sitting by designation.

Opinion

**OPINION**

KOZINSKI, Chief Judge:

*1 This is a strange case. Its resolution hinges on the absence, as a factual matter, of something we must accept as a legal matter. There are unlikely to be many more like it, so this opinion's precedential value is probably limited. We nevertheless publish pursuant to General Order 4.3. While we're at it, we offer some advice to lawyers: Don't apologize unless you're sure you did something wrong. And there's also a lesson for district judges: Don't accept too readily lawyers' confessions of error or rely on your own memory of what happened. Trials are complicated and we sometimes misremember details. That's why we have transcripts.

**Facts**

This case arises from a lawsuit filed by Philip Miller's family against the City of Los Angeles, its police department, police chief and Sergeant Mata. Philip died after Mata shot him, and plaintiffs claimed that Mata was not justified in using deadly force. The district court issued an in limine order precluding defendants from arguing that the decedent was armed when he was shot. In his summation, defense counsel Richard Arias argued that Mata thought Miller failed to surrender because he had shot Bean just moments earlier. Plaintiffs' counsel objected, apparently based on the in limine order. The court sustained the objection and instructed the jury to ignore Arias's statement.

The jury was unable to reach a verdict and the district court declared a mistrial. The case was eventually retried and a second jury returned a defense verdict.

Plaintiffs moved for sanctions against Arias for his statement during the first trial's summation. Defendants conceded that Arias had violated the in limine order but opposed sanctions on the grounds that the transgression was inadvertent, fleeting and harmless. Arias attached a declaration admitting fault and apologizing. Exercising its inherent power, see *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–46 (1991), the district court granted the motion and sanctioned defendants $63,687.50. They appeal.

**1.** We must first determine whether and to what extent Arias violated the district court's in limine order. This might seem superfluous, given that defendants conceded Arias violated the order and Arias even apologized for it. But defendants never conceded that Arias's conduct " 'constituted or was tantamount to bad faith,' " as it had to have been in order to be sanctionable under the court's inherent power. *Primus Auto Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir.1997) (quoting *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767 (1980)). A clear-cut or egregious violation is more likely to support a finding of bad faith than a minor

or ambiguous transgression. To determine whether we can sustain the district court's finding that Arias acted in bad faith, we must know what line he crossed and how far he crossed it. Defendants do contest before us the district court's finding that there was a violation, so we have the benefit of briefing and argument on this issue. We review for substantial evidence.

*2 The in limine order precluded Arias from arguing "that the decedent Philip Miller ... possessed a weapon when shot by Defendant Sergeant Mata." But Arias's summation was about how Sergeant Mata *perceived* the situation. This is Arias's entire argument, with immaterial and repetitive portions omitted:

> Anyway, *he sees* the decedent coming out. Now, *he thinks* this is happening in a split second.... And that's the time *he's got* to compute to see what happens. And *he sees,* oh, my God, he's going to do the kid.
>
> Well, what's *he base* that upon? *Does he have* a reasonable —would an objectively reasonable officer conclude that there's a fair probability that the decedent posed an imminent threat of death or serious bodily injury? What is it that *Sergeant Mata bases that opinion* upon to make it reasonable? *Does Sergeant Mata have a fair probability? He thinks* he's going to do it.
>
> Well, this is what Sergeant Mata testified to. This is the evidence.... The plaintiff has not brought in anybody to contradict what *Sergeant Mata said what he saw that night.*
>
> ...
>
> ....
>
> All right. He's coming out the door and *he's thinking,* oh, my God. He's going to do him. Well, *what does he see that leads him to believe* that the decedent is going to kill him?
>
> ....
>
> ... *These are the things that he sees.* And your body—*your mind is a computer, and you're computing all of this.* And *he's got less than a second to compute all of this* and come to the reasonable conclusion this guy is going to shoot the kid. He's an imminent threat of killing that citizen down there.
>
> But it doesn't stop right there. He's dressed like this. He's got his hand over here, and everybody else is acting differently. When he walks up to him—and he's walking deliberate and erect at that time and focused on him. And *what does Sergeant Mata say, when he believes that this guy has a gun in his hand*—and *the reason that he believes that he's got a gun in the hand* is the physical position. There's no reason for him to be handing like this. He's just got his hand in his pocket. You're walking with the left hand out. He's got the left hand over the right.
>
> ... *Sergeant Mata thinks, my God, he's going to kill him;* so he stops says, "Get down." And he says, "Get the fuck down. Get the fuck down."
>
> All of a sudden *he starts to use a swear word. He gives more emphasis to his command.* The situation has changed. Now it's imminent threat of death.
>
> ...
>
> ... What does he do? He's got his hand in the pocket. Does he take his hand out so the officer can see it? The testimony is—and they're taught it's the hands that kill you.... *That's why Sergeant Mata is trying to see where their hands are.* Do they present a threat? Did he bring his hands up? ...
>
> Did he do that? No. He keeps his hand in his pocket, other hand over. It's uncontroverted. There's no evidence to the contrary. Then he turns to the right and starts walking, and *Sergeant Mata describes it as if he is trying to hide the gun from Sergeant Mata.*
>
> *3 ....
>
> He's got his hand in here and he's walking up like this, and all of a sudden he stops. *Sergeant Mata says I don't know why* ....
>
> Okay. He stops. He comes up.... And then there's that moment where he makes a decision. And he turns to the left, and he faces Sergeants [sic] Mata.
>
> Now, here's where the toxicologist does come in. We know that he was drunk. He had .12 or 14—yeah. .12, 14 alcohol. We know he had marijuana in his system.
>
> Maybe that clouded his mind. I don't know. Maybe he was some a rage because he just fought with this kid and, you know, the blood was pumping. I don't know. But whatever happened, he's got a police officer in front of him when he saw Sergeant Silva, oh, I'm trapped. I can't go anywhere. My God, man. Get down on the ground. End it right there.
>
> He can't because he had shot Bean inside.

(Emphases added.)

The tale Arias narrates is consistently from Sergeant Mata's perspective. He tries to get the jury to see the situation from the policeman's point of view, which makes perfect sense given that the jury had to decide whether Mata acted like a reasonable officer. *See Graham v. Connor,* 490 U.S. 386, 396–97 (1989). Twenty times Arias makes it clear he's looking through Sergeant Mata's eyes and explaining what was going on in Sergeant Mata's head. Not every one of his sentences is so qualified, but there was no need to do that; it was enough, for ordinary understanding, to punctuate the narrative with occasional indications that it was a tale told through Mata's eyes.

The last sentence—the one for which the district court imposed over $60,000 in sanctions—says nothing about Miller being armed when he confronted Mata. For it to violate the district court's order, it would have to carry the clear implication that Miller still had the gun with which he'd shot Bean. It plainly did not; Miller could have shot Bean and dropped the gun or passed it to a confederate before coming out into the open.

To the extent there may have been some confusion, plaintiffs moved to instruct the jury, which the district court did and with which Arias immediately agreed:

MR. BURTON: Objection, your honor. Move to strike. I mean—

THE COURT: The objection is sustained, and that statement is ordered stricken.

MR. BURTON: Can the jury be admonished, your honor?

THE COURT: Yes. Ladies and gentlemen, remember that argument is not evidence in the case. There's no evidence to support that last statement.

MR. ARIAS: I stand corrected. There is absolutely no evidence that he had a gun in his hand. Sergeant Mata even admits that.

For Arias to accept the district court's ruling and get on with the trial was entirely understandable. But for him to admit to a transgression he never committed when the opposing party was seeking sanctions was foolish and unhelpful. His after-the-fact apology locked him and his clients into a violation he never committed. And he misled the district judge by doing so.

*4 At the same time, the district judge should have troubled to explain just how Arias violated the order before imposing sanctions. If the district court didn't want Arias to argue that Miller might have shot Bean, it should have entered an order saying so. But having issued the order it did, the district court, like the parties, was bound by its terms. Orders can constrain conduct only to the extent their words give clear notice of what is prohibited. *See* Robert Bolt, *A Man for All Seasons* 72 (Vintage Books 1960) ("It will mean what the words say!"). The district court's in limine order did not provide adequate notice that the statement Arias made was offside. *See Foster v. Wilson,* 504 F.3d 1046, 1052–53 (9th Cir.2007).

Clarity and precision are particularly important when limiting what lawyers may argue to the jury. The lawyer's job in summation is not merely to rehash the evidence but also to suggest inferences the jury should draw from the proven facts. A lawyer is a poor advocate if he fails to nudge the jurors to use their common sense and experience in filling gaps left by the proof.

This is precisely what Arias was doing here, and he was certainly entitled to argue that Sergeant Mata reasonably believed that Miller posed a threat because he had just shot Bean. Indeed, it's hard to imagine how a lawyer defending police in these circumstances can avoid arguing that the officer reasonably believed the suspect was dangerous. Were we to hold that such an argument is sanctionable, the bar would notice and it would doubtless chill zealous advocacy.

**2.** The fact remains that Arias conceded that he violated the order, and defendants didn't argue otherwise to the district court, which is probably why the district court saw no reason to belabor the point. And this concession amounts to a waiver so that we must deem a violation established for purposes of this appeal even though Arias didn't actually violate the order.

Arias and the city did not, however, concede that the violation was made in bad faith; they vigorously dispute it here and below. This raises the unusual question of how we treat a finding of bad faith for a transgression that didn't actually occur. We conclude that Arias couldn't have acted in bad faith if he did not, in fact, violate the district court's order. You can't have chicken parmesan without chicken; you can't have an amazing technicolor dreamcoat without a coat; you can't have ham and eggs if you're short of ham or eggs. And you can't have a bad faith violation without a violation.

Had Arias *actually* crossed the line drawn in the sand by the district court, it would have been permissible to infer bad faith

from his action plus the surrounding circumstances. For any such determination we'd owe the district judge considerable deference. *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir.2009) (en banc). But no inference about Arias's state of mind in committing the violation can be drawn when he committed no violation. The waiver establishes the violation as a legal matter, but any inference that Arias had an evil state of mind in doing something he didn't do is "illogical, implausible, [and] without support in inferences that may be drawn from facts in the record." *Id.*

*\*5* 3. There's an additional reason we can't sustain the sanctions in the amount imposed by the district court. It's clear the district court meant the sanctions to be compensatory. The amount sanctioned ($63,678.50) was precisely what the Millers claimed as attorney's fees for the first trial. The Millers asked for "sanctions which reflect the costs and attorney's fees for the first trial," and that's what the district court said it was granting: "The Court awards to Plaintiffs their reasonable attorneys' fees and costs incurred for the conduct of the trial."

But if the sanctions were compensatory, the district court had to link Arias's statement to the harm suffered by the Millers. In other words, the amount awarded had to compensate the Millers for the damage actually caused by Arias's eight-word sentence. The district court made no finding of causation, and without a finding that Arias's eight words caused the first jury to hang, the district court had no authority to order defendants to compensate plaintiffs for the attorneys' fees and costs they spent on the first trial. *See In re Dyer*, 322 F.3d 1178, 1195 (9th Cir.2003) (remanding "for a determination of the Trustee's actual damages flowing from the automatic stay violation alone" if compensatory sanctions were to be upheld); *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1109 (9th Cir.2002) (upholding compensatory sanctions because "the amount the court imposed reflected its assessment of the actual harm incurred by Plaintiff").

To the extent the district court tacitly found that Arias's eight-word sentence caused the jury to hang, any such finding is unsupported by the record. Immediately after Arias spoke those eight words, (1) opposing counsel objected, (2) the judge cautioned the jury and (3) Arias himself said, "I stand corrected. There is absolutely no evidence that he had a gun in his hand. Sergeant Mata even admits that." *See* p. 19537–38 *supra*. We have a strong presumption that jurors follow instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987). And Arias himself helped neutralize whatever impression his sentence may have left on the jury by devouring his words and conceding there's "absolutely no evidence" that Miller was armed.

In the opposition to sanctions, Arias noted that he and the Millers' attorney spoke at some length with the jurors after the first trial. If any of the jurors had said anything suggesting that Arias's single sentence caused the jury to hang, the Millers would no doubt have proffered a declaration to that effect. Federal Rule of Evidence 606(b) bars only "an inquiry into the validity of a verdict or indictment." Juror statements would have been admissible because the jury here returned no verdict. That the Millers failed to proffer any juror statements strongly suggests that the jurors said nothing supporting their claim.

The district court may also have meant the sanctions to vindicate the court's authority and deter future misconduct, but $63,687.50 is an extraordinary amount for such noncompensatory sanctions. We've held that non-compensatory sanctions of that magnitude are akin to criminal contempt and may be imposed only by following the procedures applicable to criminal cases, including appointment of an independent prosecutor, proof beyond a reasonable doubt and a jury trial. *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136–42 (9th Cir.2001) (citing *Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538, 544 (1989), as "implying that $5,000, at least in 1989 dollars, is the cutoff for a serious fine warranting a jury trial"). Other circuits are in accord. *See Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 139 (2d Cir.2000) (reversing $2000 in non-compensatory sanctions because "the District Court erred in imposing[the sanctions] without providing the procedural protections employed in the criminal process"); *see also Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 808–09 (8th Cir.2005) (requiring the protections of the criminal process before imposing $50,000 in non-compensatory sanctions); *Crowe v. Smith*, 151 F.3d 217, 227–29 (5th Cir.1998) (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833 (1994), as suggesting that, for individuals, noncompensatory sanctions of $5000 or more require a jury trial); *Buffington v. Balt. Cnty., Md.*, 913 F.2d 113, 133–35 (4th Cir.1990) (requiring the protections of the criminal process before imposing $7000 in non-compensatory sanctions). None of these procedures was employed here, and we therefore cannot sustain the sanctions as intended to vindicate the court's authority and deter future misconduct.

\* \* \*

*6 We reverse the district court's order imposing sanctions. On remand, the district court may, if it chooses, hold further proceedings, consistent with our opinion, to determine whether any sanction is warranted for Arias's conceded violation.

**REVERSED AND REMANDED.**

IKUTA, Circuit Judge, dissenting:

*6 The defense attorney violated the district court's in limine order. Everyone who was in the courtroom that day agreed with this conclusion: the district court, the plaintiff's attorney, the defendant, *and even the defense attorney himself.* Only the majority, perched high in its appellate tower, claims an ability to discern from the cold trial transcript that there was no such violation. The majority's holding flouts the deferential standard of review established by *United States v. Hinkson,* which requires us to uphold the district court's determination unless it was "illogical, implausible, or without support in inferences that may be drawn from facts in the record." 585 F.3d 1247, 1251 (9th Cir.2009) (en banc). Of course, the majority claims that it is not striking down the district court's ruling that Arias violated the in limine order, but only invalidating the district court's imposition of sanctions on the ground that *there was no violation of the order at all.* But such casuistry does nothing more than skirt the deference required by *Hinkson.*

I

Our cases make clear that the district court is in a better position to determine whether a party engaged in sanctionable conduct than this court, which reviews only a cold record. *See Lasar v. Ford Motor Co.,* 399 F.3d 1101, 1115 (9th Cir.2005) (deferring to the district court's determination that plaintiff's counsel violated an in limine order and noting that "[w]hat this record does not show is the tone and inflection of [counsel's] voice"). For this reason, we owe "great deference" to the factual findings of the district court, *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997) (quoting *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1366 (9th Cir.1990) (en banc)), which has the opportunity to observe the sanctioned party's misconduct and can better assess factors like motive, intent, and credibility, *see Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.,* 210 F.3d 1112, 1119 (9th Cir.2000) (deferring to the district court's "findings of fact and assessments of counsels' credibility" because the judge conducted hearings and "had ample opportunity to evaluate the legitimacy of counsels' justifications for their client's continued non-compliance with the court's order"). Here the majority does not even attempt to consider Arias's misconduct in context, instead providing all of three sentences describing the events leading up to Arias's closing argument. Maj. op. at 19533. Because the context makes clear that the district court did not abuse its discretion in deciding there was a violation of the in limine order, I provide a fuller discussion of the facts.

*7 In the early morning hours of January 10, 2007, Sergeant Cesar Mata of the Los Angeles Police Department fatally shot Philip Arthur Miller. Miller had been attending a large party at a Masonic Lodge in Los Angeles that had started a few hours earlier. The police were called when a fight broke out at the party. After the police (including Sergeant Mata) arrived, shots were fired inside the Lodge and people came pouring out of the building. Sergeant Mata saw one man, Levon Bean, stumble out of the Lodge holding his bloodied head. Seconds later, Miller exited the Lodge with his "hand in his right front pocket and his left hand across his torso in support" and began walking in Bean's direction. Sergeant Mata shouted at Miller to get down, but Miller did not comply. Sergeant Mata then fired two shots at Miller, who instantly went down.[1] Miller died from his injuries.

| 1 | Sergeant Mata later testified that he shot Miller because he believed Miller had a handgun in his pocket, and was either "walking towards Mr. Bean to finish him off," or was going to shoot Sergeant Mata. |
|---|---|

Miller's mother and son filed a § 1983 lawsuit against the City of Los Angeles, the Los Angeles Police Department, Chief of Police William Bratton, and Sergeant Mata, alleging that Mata's use of deadly force was unjustified. Prior to trial, the plaintiffs moved to preclude the defendants from "contending or arguing that [Miller] was in possession of a firearm when [Sergeant Mata] shot and killed him" because the defendants had produced no evidence during discovery supporting such a theory and "allowing such an argument would both confuse the jury and prejudice the plaintiffs." The plaintiffs expressed concern that the defendants "intend[ed] to argue ... that a civilian might have removed the firearm from Mr. Miller's corpse before the officers searched it." The motion included, as an attachment, a forensic analysis of some gunshot residue that was found on Miller's body. This report stated that the residue indicated Miller "may have" (a) discharged a firearm; (b) had his hands otherwise in an environment of gunshot residue; or (c) received particles of gunshot residue from an environmental source. The plaintiffs' motion also asked the

court to exclude the "very equivocal" results of this forensic analysis.

The defendants did not oppose the motion. Although under local rules, their failure to do so could have been "deemed consent" to the relief sought, the district court nevertheless considered and granted the motion on its merits, ruling that:

> On the record before the Court, it appears that no evidence supports any argument that Miller actually possessed any firearm at the time he was shot by Sergeant Mata. Accordingly, insofar as the Motion seeks to bar Defendants from introducing such argument or arguing to that effect, the Court GRANTS the Motion. This ruling does not, however, bar testimony from Defendant Sergeant Mata as to his state of mind or beliefs regarding whether or not Miller was concealing a gun ... nor argument from counsel on that subject. The defense cannot argue (or introduce evidence) that Miller *actually* possessed a weapon when shot.

*8 On the third day of trial, before conducting a redirect examination of Sergeant Mata, defense counsel Richard Arias requested a sidebar conference. Arias told the court that he wanted to respond to questioning by the plaintiffs' attorney about whether Sergeant Mata had recovered a firearm from Miller's body (the answer being no), by eliciting testimony from Mata about cases in which guns had been removed from bodies by other people. Arias stated that he wanted to make the point that "[j]ust because you didn't find a gun didn't mean that he didn't have a gun." The court ruled that this proposed line of questioning would violate its order in limine. Arias then asked to be relieved of the order, but the court denied his request.

After this sidebar, in his re-direct examination of Sergeant Mata, Arias asked: "How many times have you confronted individuals with guns in their hands before this incident?" This drew an immediate objection from plaintiffs' counsel, which the court sustained. Noting again that there was no evidence that Miller had a gun "in his possession, in his hand at this time," and that it had previously ruled that Arias could not pursue this line of questioning, the court refused to hear Arias's further arguments on the issue. Immediately after this interchange with the court, Arias asked Sergeant Mata: "Have you ever arrested people with guns before?" Again, plaintiffs' counsel objected. The court ruled that Arias could ask the question only if he reworded it to make it clear he was "asking it for the purpose of showing [what was] in the officer's mind at the time." In connection with this ruling, the court gave the jury a limiting instruction, explaining that the jury could consider Mata's testimony about his experiences in other cases only as evidence of his state of mind at the time of the shooting, not to draw the inference that Miller possessed a gun when he was shot.

The attorneys delivered their closing arguments on the following day. During his closing argument, Arias began discussing the morning in question. He first described Sergeant Mata's belief that Miller was going to kill Bean, based on the fact that Miller exited the Lodge just after Bean and that (in contrast to the people running screaming from the Lodge) Miller was walking slowly with his hand in his pocket, as if he had a gun. Arias then began describing Miller's behavior:

> [Miller] walks up to [Bean], looking at him with his hand like this, and all of a sudden he looks up in a startle because he sees the police officer for the first time because [Mata] is screaming at him, "Get the f* * * down. Get down." He looks up and what does he do at that time? Does he at that time go, "Okay. I'm getting down. Hey, easy. Easy ..." Does he do that?
>
> No. What does he do? He's got his hand in the pocket [and walks north]....
>
> ...
>
> Okay. He stops. He comes up ... And then there's that moment where he makes a decision. And he turns to the left, and he faces Sergeant[ ] Mata.
>
> *9 Now here's where the toxicologist does come in. We know that he was drunk. He had .12 or 14—yeah. .12, [.]14 alcohol. We know he had marijuana in his system.
>
> Maybe that clouded his mind. I don't know. Maybe he was [in] a rage because he had just fought with this kid and, you know, the blood was pumping. I don't know. But whatever happened, he's got a police officer in front of him when he saw Sergeant [Mata], oh, I'm trapped. I can't go anywhere. My God, man. Get down on the ground. End it right there.
>
> He can't because he had shot Bean inside.

At this point, plaintiffs' counsel objected and moved to strike Arias's last statement that Miller had shot Bean inside the Lodge. The court sustained the objection, struck the statement, and admonished the jury that "argument is not evidence in the case" and there was "no evidence to support that last statement." Arias immediately said to the jury: "I

stand corrected. There is absolutely no evidence that [Miller] had a gun in his hand." Arias then completed his closing argument and the case was submitted to the jury. After deliberating for three days, the jury was unable to reach a unanimous verdict and the district court declared a mistrial.

On March 2, 2009, the plaintiffs moved for sanctions against Arias for his statement during closing argument that Miller had shot Bean. In their motion, plaintiffs argued that Arias's statement contributed to the hung jury and therefore requested sanctions in the amount of their costs and attorneys' fees. In opposing the motion, the City conceded that the statement violated the court's in limine order because, in context, it implied that "Miller drew his gun and shot Bean inside the Temple and then followed him outside in order to finish him off, to give him the coup de grace." By the City's own admission, the content of the statement was "contrary to the court's order and [the] evidence." Nevertheless, the City opposed sanctions on the grounds that (1) the statement was a slip of the tongue rather than willful disobedience of a court order; (2) the court should relieve the City from Arias's mistake under Federal Rule of Civil Procedure 60; (3) the court had given the jury a curative instruction after Arias's statement; and (4) there was no evidence that the jury had relied on Arias's statement and thus no evidence that the statement had caused the mistrial. Attached to the City's opposition papers was a sworn declaration from Arias in which he apologized for his statement, which he "freely, openly and unabashedly admit[ted] was contrary to the court's Motion in Limine order."

After a hearing on the sanctions request, the court granted the plaintiffs' motion. In the order imposing the sanction, the court stated that Arias deliberately and willfully violated the court's in limine order and thus engaged in conduct "tantamount to bad faith." The court gave several reasons for this conclusion. First, the court pointed out that "[t]he day before his closing argument, Mr. Arias requested a sidebar conference for the Court to 'clarify' its Motion in Limine No. 1 ruling and specify what testimony he could elicit without violating the ruling." Given that Arias made the statement that Miller shot Bean just "one day after seeking 'clarification' of the Court's Order on the subject and, after being reminded of the ruling, seeking belatedly to have it reconsidered," the court stated that it "defie[d] logic" to think that Arias did not make the statement on purpose. Second, the court pointed out that not a "shred of evidence" supported the contention that Miller had shot Bean inside the Lodge. Finally, the court noted that before the close of trial, it had received a note from a juror asking if anyone had been prosecuted for shooting Bean,[2] and Arias knew this fact when he gave his closing argument.

[2] The record does not indicate whether anyone was, in fact, prosecuted for shooting Bean.

*10 The court also explained why it thought a sanction was warranted, noting that Arias's statement not only violated the in limine order but "went beyond that by stating as a fact [Miller] not only had a gun, he had used it to shoot Mr. Bean inside the Masonic Lodge." That statement was both "inflammatory" and "seemingly ... designed to appeal to the speculations of the jury," and the court reasoned that if it did not sanction Arias's conduct, it "would be issuing an invitation to counsel to insert into closing argument a statement that has no support in the record." Therefore, the court invoked its "inherent power" as a federal tribunal to impose a monetary sanction against the City and awarded plaintiffs their "reasonable attorneys' fees and costs incurred for the conduct of the trial," which the court calculated to be $63,687.50.

II

The majority claims that the district court erred in finding bad faith for a single reason: that Arias did not violate the district court's in limine order. Maj op. at 19539. This conclusion cannot withstand scrutiny.

As a threshold matter, the City conceded that Arias did violate the in limine order, and as the majority acknowledges, this concession requires us "to deem a violation established for purposes of this appeal." *Id.* at 19539. That should be the end of the matter. But in an illogical leap, the majority goes on to hold that the district court abused its discretion in ruling that Arias violated the order in bad faith—because under the majority's de novo review, Arias did not violate the order at all. *See id.* This conclusion makes no sense. Once we find adequate support for the district court's ruling that Arias violated the in limine order, we cannot ignore that ruling when assessing whether the district court's finding that Arias acted with the requisite intent was "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Hinkson,* 585 F.3d at 1251.

But even if the City had not waived any argument as to whether Arias violated the order, the majority has no authority to review the issue de novo. A district court's determination that a party has violated an in limine order is an evidentiary ruling that we review for abuse of discretion. *Lasar,* 399 F.3d at 1115 n.12. It is undisputed that the district court here

stated the correct legal standard for imposing sanctions in its inherent power. Because the district court's application of law to the facts as they occurred at trial "requires an inquiry that is essentially factual," *Hinkson*, 585 F.3d at 1259 (quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.1984) (en banc), *overruled on other grounds by Estate of Merchant v. C.I.R.*, 947 F.2d 1390, 1392–93 (9th Cir.1991)), we may not reverse such a ruling unless it is "illogical, implausible, or without support in inferences that may be drawn from facts in the record," *id.* at 1251.

*\*11* Here the majority reverses the district court on the grounds that: (1) Arias's statement does not literally violate the order, because it "says nothing about Miller being armed when he confronted Mata"; and (2) the majority does not think the statement *clearly* implies that Miller still had the gun with which he shot Bean because (the majority speculates) Miller could have discarded it.

This de novo approach is completely contrary to *Hinkson*, according to which "we may not simply substitute our view for that of the district court, but rather must give the district court's findings deference." *Hinkson*, 585 F.3d at 1262. The majority ignores this command, based on an erroneous reading of the law. First, it is of no import that the words Arias used did not literally violate the order. In *Lasar*, for example, the district court determined that defense counsel's statement that plaintiff visited "some local establishments" violated the court's order prohibiting arguments that plaintiff had been drinking alcohol, even though counsel had chosen his words carefully to avoid directly violating the order. *Lasar*, 399 F.3d at 1106, 1114–15. We deferred to the district court, emphasizing our inability to consider the "tone and inflection" of defense counsel's voice and holding that the district court did not clearly err in its interpretation of the overall message that the statement conveyed. *See id.* at 1115. Nor is the majority entitled to reverse the district court merely because Arias's statement is susceptible to more than one interpretation, and the majority can dream up an innocent explanation. Maj. op. at 19537. As *Hinkson* explained, "we do not automatically *reverse* a district court's factual finding ["[o]r 'essentially factual' application of fact to law"] if we decide a 'mistake has been committed.'" *Hinkson*, 585 F.3d at 1263 & n.22 (emphasis in original) (citing *McConney*, 728 F.2d at 1202). Our job as an appellate panel is limited to considering whether the district court's conclusion is supported by inferences that can be drawn from the record, and here it clearly can, as demonstrated by the City's and Arias's acknowledgement that the court's order had been violated. We cannot reverse the district court simply because we would have drawn a different inference. *See id.*

Indeed, the majority's contrary approach here makes an end run around *Hinkson*. In upholding a district court's denial of a motion for a new trial, *Hinkson* held that the district court's "findings of fact, and its application of those findings of fact to the correct legal standard, were not illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* at 1267. The majority's approach bifurcates this standard: it allows the reviewing court to uphold the district court's "findings of fact" but then reverse the court's "application of those findings" to a legal issue, not because the district court's *application* was erroneous but because the *findings* were. As illogical as that sounds, it is exactly what the majority does here. After upholding the district court's factual finding (that Arias violated the in limine order), the majority strikes down the district court's application of that fact to the legal standard for imposing sanctions on the ground that Arias did not actually violate the order. This makes no sense. Once the court has concluded (as it must) that the district court's determination that Arias's statement violated the in limine order is amply supported by "inferences that may be drawn from facts in the record," *id.* at 1251, as well as by the City's and Arias's own admissions, we must also uphold the application of that fact to the standard for imposing sanctions.

*\*12* And even the majority's erroneous de novo review is flawed. The majority claims that Arias did not violate the order because his "summation was about how Sergeant Mata *perceived* the situation." Maj. op. at 19534 (emphasis in the original). But the majority focuses on the portions of the transcript that support its view, ignoring the crucial shift in perspective before Arias's statement that Miller had shot Bean. On its face, the relevant portion of Arias's closing argument portrayed Miller's mental state and conduct from Miller's perspective, not from Sergeant Mata's perspective. The language described what Miller was thinking and seeing:

> And then there's that moment where *he* makes a decision.... Maybe *he* was [in] a rage because *he* had just fought with this kid and, you know, the blood was pumping.... But whatever happened, *he's* got a police officer in front of him when *he* saw Sergeant [Mata], oh, *I'm* trapped. *I* can't go anywhere. My God, man. Get down on the ground. End it right there. *He* can't because *he* had shot Bean inside.

It is difficult to argue that Arias's description of Miller's decision-making process, including use of the first person,

was not from Miller's perspective. Arias conveyed the unambiguous message that *Miller* thought he could not surrender to the officers because he was caught red-handed with the gun he had used to shoot Bean inside the Lodge. What is more, the majority fails to explain the portion of the transcript directly before this statement, in which Arias speculated that the alcohol and marijuana in Miller's system at the time of the shooting may have "clouded his mind." Because Sergeant Mata could not have known about the toxicologist's lab results at the time he shot Miller, Arias's description of Miller's clouded judgment could not have been a statement about Sergeant Mata's beliefs. Clearly, the district court made a reasonable determination that Arias's statement that Miller shot Bean inside the Lodge was intended as a statement of fact.

### III

Because we must uphold the district court's ruling that Arias violated the in limine order under any standard, the only question left is whether such violation "constituted or was tantamount to bad faith." *Primus*, 115 F.3d at 648 (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)). Here the district court concluded that Arias violated the order in bad faith because, among other things, the court had clarified the scope of the order and rejected Arias's belated motion to vacate it just one day earlier. Further, the court concluded that Arias's dramatic declaration that Miller "had shot Bean inside" was a reckless misstatement of fact made for the improper purpose of appealing to the speculations of the jury. As the court correctly noted, Arias was aware that the jury had expressed curiosity about who had shot Bean, and there was not "a shred of evidence in the record" that Miller had shot anyone. All these findings are supported by the record.

*13 It is well established that "an attorney's reckless misstatements of law and fact, when coupled with an improper purpose, ... are sanctionable under a court's inherent power." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir.2002) (quoting *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir.2001)).[3] The court's determination that Arias's conduct constituted bad faith was not illogical or implausible and had ample support in the record; we are therefore bound to uphold it. The majority gives no reason to overturn this conclusion— other than the impermissible (and incomprehensible) reason that Arias violated the in limine order "as a legal matter" but not as a matter of fact. Maj op. at 19539.

3   The majority's implicit assumption that the district court could not impose sanctions on Arias unless he violated a court order is also wrong. As we have explained, "[s]anctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *B.K.B.*, 276 F.3d at 1108 (quoting *Fink*, 239 F.3d at 994).

### IV

The majority gives another reason why it is striking down the district court's imposition of sanctions: the majority claims it was necessary for the district court to make an explicit finding that Arias's conduct "caused" the mistrial in order to justify shifting the expenses of the first trial. Maj op. at 19539–40. Again, this mischaracterizes our case law.

When exercising its inherent powers, a district court can impose a sanction that serves the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the other party whole for expenses caused by his opponent's obstinacy." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (quoting *Hutto v. Finney*, 437 U.S. 678, 691 (1978)) (alterations in original); *see also B.K.B.*, 276 F.3d at 1108. In light of this dual purpose, the district court is not obliged to limit the award of sanctions to damages directly caused by the sanctioned party's bad faith conduct. In *Chambers*, for example, a defendant engaged in unethical conduct, including misleading the court, violating court orders, and engaging in dilatory tactics. *Chambers*, 501 U.S. at 35–40. Ultimately, the district court imposed sanctions on defendant consisting of "attorney's fees representing the entire cost of the litigation," *id.* at 45, which amounted to nearly a million dollars, *id.* at 40. Rejecting defendant's argument that such a large sanction was not "tailor[ed] ... to the particular wrong," *id.* at 56, the Supreme Court held that in light of defendant's egregious conduct, it "was within the court's discretion to vindicate itself and compensate" the plaintiff by imposing the fee-shifting sanction. *Id.* at 57. Contrary to the majority's assertion, neither the Supreme Court nor we have ever held that a district court has "no authority," maj. op. at 19539–40, to impose a fee-shifting sanction unless it finds that the sanctioned party's misconduct was responsible for the cost of litigation. *See Chambers*, 501 U.S. at 37; *see also Lasar*, 399 F.3d at 1107. No doubt we have deemed a sanction to be reasonable where an award "reflected [the court's] assessment of the actual harm incurred by Plaintiff," *B.K.B.*, 276 F.3d at 1109, but we have never held that an award is per se unreasonable if the court does not make such a factual finding.[4]

4   Because a district court need not make such a finding before imposing sanctions, the majority's "dog that didn't bark" theory, i.e., that we can infer a lack of causation from Miller's failure to report on anything he was told by the jury after the first trial, maj. op. at 19541, is both speculative and entirely irrelevant.

**\*14** As in *Chambers* and *Lasar*, the record here shows that the award of attorney's fees was intended to compensate the plaintiff for Arias's prejudicial statements, vindicate the court's authority, and deter future misconduct. First, the district court noted the prejudice to the plaintiffs, namely, that Arias's statement was both inflammatory and "seemingly ... designed to appeal to the speculations of the jury." Given that the statement came right before the jury began deliberating (and considering that at least one member of the jury had expressed curiosity as to who had shot Bean), the court could reasonably have been concerned that its curative instruction was insufficient to mitigate this prejudice, which therefore contributed to the mistrial. *See, e.g., Doe ex rel. Rudy–Glanzer v. Glanzer,* 232 F.3d 1258, 1270 (9th Cir.2000) ("[T]he trial court is in a far better position to gauge the prejudicial effect of improper comments than an appellate court which reviews only the cold record.") (internal quotation marks omitted) (quoting *Kehr v. Smith Barney, Harris Upham & Co.,* 736 F.2d 1283, 1286 (9th Cir.1984)). Second, the court's order indicates that it deemed Arias's conduct to be a grave affront to the dignity of the court. The court noted that Arias's statement that Miller shot Bean was not only a direct violation of its order, but also a flagrant violation, especially considering that Arias made the statement just one day after seeking clarification' of the order during the sidebar conference. Finally, the district court concluded that the harshness of the sanction would serve a deterrent purpose. Indeed, the court reasoned that if it did not impose a sanction, it would effectively be inviting counsel "to insert into closing argument" prejudicial and unsupported statements. In the face of the court's determination that it was necessary to declare a mistrial, and in light of Arias's perceived intransigence, the district court acted within its discretion in choosing to shift attorneys fees and costs for the purposes of compensating the plaintiff and vindicating the court's authority to enforce its evidentiary rulings.

Contrary to the majority's assertion, dual-purpose fee-shifting sanctions do not require the due process protections applicable to criminal trials, even where the sanctions are for substantial amounts. As the Supreme Court in *Chambers* made clear, courts may impose such sanctions after notice and a hearing. *See Chambers,* 501 U.S. at 36, 40 (upholding dual-purpose fee-shifting sanction in the amount of $996,644.65). The further procedural protections of a jury trial, independent prosecutor, and reasonable-doubt standard of proof are necessary only when the court imposes sanctions that are "criminal in nature," not civil sanctions such as those at issue here. *Lasar,* 399 F.3d at 1110 (citing *Int'l Union, United Mine Workers v. Bagwell,* 512 U.S. 821, 826–27 (1994)); *F.J. Han-shaw Enters., Inc. v. Emerald River Dev., Inc.,* 244 F.3d 1128, 1143 (9th Cir.2001). And, as we have recognized, "a court's decision to assess costs has 'never ... been considered [a] criminal' sanction." *Lasar,* 399 F.3d at 1111 (alterations in original) (quoting *Bagwell,* 512 U.S. at 833). Rather, fines made payable to another party, as they were here, are generally considered remedial in nature unless they bear no relation to "any actual or estimated harm." *Id.* None of the cases cited by the majority, *see* maj. op. at 19541–42, are to the contrary, because not one involved a fee-shifting sanction or required payment of a sanction to a party.[5] In any case, the City's failure to raise a due process challenge either in the district court or on appeal should bar this court from considering the issue.

5   *See F.J. Hanshaw,* 244 F.3d at 1136–42 (striking down $500,000 flat fine made payable to the court); *Blanton v. City of N. Las Vegas, Nev.,* 489 U.S. 538, 544 (1989) (noting that criminal offenses punishable by fines of less than $5,000 are defined by Congress as "petty" and generally do not come with the right to jury trial); *Mackler Prods., Inc. v. Cohen,* 225 F.3d 136, 139 (2d Cir.2000) (reversing $2,000 sanction that was explicitly punitive and made payable to the court); *Plaintiffs' Baycol SteeringComm. v. Bayer Corp.,* 419 F.3d 794, 808–09 (8th Cir.2005) (holding that a $50,000 sanction made payable to the court was "excessive" and distinguishing a case in which the court had upheld a $66,656.33 sanction in the form of attorney's fees); *Crowe v. Smith,* 151 F.3d 217, 221, 227–29 (5th Cir.1998) (reversing $5 million and $75,000 flat fines made payable to the court and emphasizing that further procedural protections were necessary where the alleged discovery violations were committed outside the court's presence); *Buffington v. Balt. Cnty., Md.,* 913 F.2d 113, 132–35 (4th Cir.1990) (vacating two $6,785.37 civil sanctions made payable to the court and imposed without a hearing after an aborted criminal contempt prosecution).

**V**

**\*15** The majority's approach circumvents the standard we have adopted in *Hinkson* and elides the deference due to the district court's decision to impose sanctions in its inherent

power. As we said in *Hinkson,* we owe special deference to the district court when it comes to "questions such as motive[and] intent," where the "application of the rule of law to the facts requires an inquiry that is essentially factual—one that is founded on the application of the fact-finding tribunal's experience with the mainsprings of human conduct." *Hinkson,* 585 F.3d at 1259–60 (internal quotation marks omitted) (quoting *McConney,* 728 F.2d at 1202). Instead of following this path, the majority today undertakes a de novo review and strikes down the district court's ruling based on its own strained reading of a cold trial transcript —even though the defense attorney and defendant (and everyone else in the courtroom that day) thought that the district court had ruled correctly. Under today's decision, the district court's "broad fact-finding powers with respect to sanctions," *Primus,* 115 F.3d at 649, and unique ability to assess motive and intent based on firsthand observations, *see Lasar,* 399 F.3d at 1115, count for very little. Accordingly, I respectfully dissent.

Parallel Citations

11 Cal. Daily Op. Serv. 13,248, 2011 Daily Journal D.A.R. 15,764

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# PROOF OF SERVICE

*Valdez vs. Kismet*
(Service on behalf of Appellants Geraldine A. Valdez and Enrique Hernandez Pulido)
USDC Case No. 09cv589 BTM (BLM) and 09cv590 BTM (BLM)

I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, California. My business address is 350 Tenth Avenue, Suite 1300, San Diego, California 92101-8700.

On November 16, 2011, at San Diego, California, the following document(s) were served: **NOTICE OF RECENT NINTH CIRCUIT DECISION** on the parties in said action as follows:

| | |
|---|---|
| Ali M. M. Mojdehi, Esq.<br>Janet D. Gertz, Esq.<br>Monica J. Clipper, Esq.<br>Rayla D. Boyd, Esq.<br>Baker & McKenzie<br>12544 High Bluff Drive<br>Third Floor<br>San Diego, CA 92130<br><br>Telephone: 858.523.6200<br>Fax: 858.259.8290<br>Email addresses:<br>ali.m.m.mojdehi@bakernet.com<br>janet.d.gertz@bakernet.com<br>monica.j.clipper@bakernet.com<br>rayla.d.boyd@bakernet.com | Counsel for Plaintiff<br>**Kismet Acquisition, LLC** |
| Jeffrey Isaac Ehrlich, Esq.<br>I. Drake, Esq.<br>The Ehrlich Law Firm<br>411 Harvard Avenue<br>Claremont, CA 91711<br><br>Telehpone: 909.625.5477<br>Fax: 909.625.5477<br>E-mail address:<br>jehrlich@ehrlichfirm.com<br>idrake@ehrlichfirm.com | Appellee **Kismet Acquisition** |
| Jerry L. Icenhower (VIA U.S. MAIL)<br>Donna Lee Icenhower<br>17410 Plaza Sonrisada<br>San Diego, California 92128 | **Debtors-in-Possession**<br>*Pro Se* |

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  ☒  **ELECTRONIC TRANSMISSION:** I filed the foregoing document with the Clerk of Court for the , using the Electronic Case Filing ("ECF") system of the Court. The attorney listed above has consented to receive service by electronic means and is registered with the Court's ECF system and was served a "Notice of Electronic Filing" sent by ECF system.

3  ☒  **BY MAIL:** I am readily familiar with our business practice for collecting, processing and mailing correspondence and pleadings with the United States Postal Service. Such correspondence and pleadings are deposited with the United States Postal Service on the same day that they are placed for mailing in the ordinary course of business. I sealed each envelope and, with the postage thereon fully prepaid, placed it for mailing in accord with our business' practice. (C.C.P. § 1013(a) and (b))

7  ☒  **FEDERAL COURT:** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 16, 2011, at San Diego, California.

/s/ *Micaela P. Banach*